**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

|  |  |
|---|---|
| CINCLIPS, LLC, <br>  a Georgia Limited Liability Company <br> <br> Plaintiff, <br> <br> v. <br> <br> Z KEEPERS, LLC, <br>  a Florida Limited Liability Company, <br> <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 8:16-cv-01067-SDM0JSS

## PRETRIAL STATEMENT[1]

Plaintiff, Cinclips, LLC ("Plaintiff") and Defendant, Z Keepers, LLC ("Defendant") file

this Joint Pretrial Statement in accordance with the Case Management Scheduling Order and L.R.

3.06.

### I.    BASIS OF FEDERAL JURISDICTION

Jurisdiction is proper in the Court pursuant to 28 U.S.C. §1331 and 1338(a) because

this is a civil action relating to patents and the court has original jurisdiction to any civil action

arising under any Act of Congress relating to patents.

### II.    CONCISE STATEMENT OF THE NATURE OF ACTION

This is a single-count action against Defendant for patent infringement of U.S. Patent

No. 9,133,609 ("the '609 Patent"), which was granted on September 15, 2015.   Defendant has not

---

[1] Plaintiff regrets that the parties were unable to submit a joint pretrial statement in accordance with the Local Rules. This version of the document is the last version exchanged between the parties with the addition of this footnote and Plaintiff's counsel's signature at the bottom.  Defendant objected to Plaintiff's footnotes and instead indicated that the parties would file separate reports.  *See* Notice of filing at Exhibit A.

asserted any counterclaims. The '609 Patent was invented by Dow Blaine, Plaintiff's founder and owner. The '609 Patent was assigned to Plaintiff. Defendant has denied Plaintiff's allegations and asserted affirmative defenses challenging the patent's validity and enforceability.

## III. BRIEF, GENERAL STATEMENT OF EACH PARTY'S CASE

### *Plaintiff's Case:*

The '609 Patent is directed to a "Mounting Driver for Undermounted Sinks." Plaintiff and Defendant are competitors in the sink support industry and offer competing solutions for supporting an undermounted sink. Plaintiff contends that Defendant has infringed and continues to infringe Claims 8-13 and 16-20 (the "Asserted Claims") of the '609 Patent by having made, offering for sale, using, selling, marketing, and importing a product under the name U-Mounts. Defendant's U-Mounts product does not have an alternative non-infringing use. Plaintiff seeks both monetary and injunctive relief for the infringement.

The Asserted Claims require a mounting bracket, with particular features at each end to enable the bracket to mount under an undermounted sink, and affix to a wall. In this fashion, the undermounted sink receives significant additional support and is unlikely to fall. Other solutions do not provide the strength of the '609 Patented solution, and require additional modifications to the counter surface (typically marble, granite, or other stone).

### *Defendant's Case[2]:*

The '609 Patent is directed to a "Mounting Driver for Undermounted Sinks." Plaintiff and Defendant are competitors in the sink support industry and offer competing solutions for

---

[2] Plaintiff objects to Defendant's extensive statement of the case as contrary to the Local Rules. Plaintiff provided a draft of this pretrial statement to Defendant on June 18, 2017 to facilitate a proper meet and confer of all of the issues required by the Local Rules for this pretrial conference. Defendant failed to provide its response until 5pm June 28, 2017, the eve of the deadline to file this statement, which did not give Plaintiff adequate time to review Defendant's modifications. Plaintiff objects to Defendant's attempt to introduce numerous new theories into this case by way of its pretrial submission, which is merely a veiled additional brief on additional legal theories attempting to avoid liability. Defendant objects to Plaintiff including this footnote.

supporting an undermounted sink.  Defendant's undermount sink support does not infringe Claims 8-13 and 16-20 (the "Asserted Claims") of the '609 Patent.  Defendant's development of its undermount sink support (the "U-Mount") is Defendant's plastic version of a furring strip which Defendant's principal, David Smith, used for many years installing undermount sinks in residences prior to Plaintiff seeking patent protection for Plaintiff's CinClips product. Defendant's sale of its U-Mounts is therefore lawful competition.

To infringe any of the Asserted Claims, the mounting driver must include a support bar having a first end shaped and dimensioned to engage the underside of the sink and a second end with a "plurality of screw holes formed along the length of the second end". '609 Patent claims 8 and 16. The '609 patent's specification further explain the purpose of this feature which is that the plurality of screw holes formed along the length of the second allows for the support bar to be positions such that one of the sets of screw holes formed along the length can be perpendicularly screwed into the cabinet wall.  The figure accompanying the claims and the specification depict a second end with multiple sets of screw holes along the length of a curved second end. Neither Defendant's original U-Mounts products nor its redesigned U-Mounts products include a plurality of screw holes formed along the length of the second end.  Moreover Defendant's U-Mount does not permit the perpendicular insertion of screws into the cabinet wall no matter which angle it is installed at.  Instead the U-Mounts is designed to be installed at an upward angle so that as the mounting screws are installed, the first end of the support presses more firmly against the sink, unlike Plaintiff's perpendicular application.

In addition, the Asserted Claims all require that "with the first end of the support bar pressed against the underside of the sink, the second end of the support bar *is rigidly secured* to the wall of the cabinet." *Id.* (emphasis added). Neither Defendant's original U-Mounts products

nor its redesigned U-Mounts products are manufactured, sold, or imported in a state of being rigidly secured to the wall of a cabinet, nor does Defendant install its U-Mounts products, nor does pressing a U-Mounts product against the underside of a sink inherently result in the second end of the support bar being rigidly secured to the wall of an adjacent cabinet. The phrase "is rigidly secured" plainly affirmatively requires either a rigidly secured state of the second end of the support bar, or that, as a characteristic of the support bar, such a rigidly secured state be inherently attained when the first end is pressed against the underside of the sink. This is particularly clear given the use of the phrases "dimensioned to engage", "for the passage of a mounting screw", and "for positioning" in the Asserted Claims, which demonstrates that, when it wanted to, the '609 Patentee knew how to recite relational functionality as a characteristic of a claimed structural element, without affirmatively requiring that the relational function be carried out. Thus, Defendant does not infringe claim 8 or claim 16, even assuming *arguendo* that claim 8 or claim 16 reads on the U-Mounts products installed in a sink cabinet, which neither does.

Claim 8 further requires "a support being extending [along the second end of the support bar] from the central support body to a distal end and a back surface cap member." Defendant's U-Mounts products do not include this element, both because what Plaintiff has identified as a support beam of the second end of the U-Mounts products terminates before a distal end, and because, in a direction toward the distal end, the purported support beam extends *parallel to* a back surface cap member, not *to* a back surface cap member. This is material to the difference between the manner in which the U-Mount functions and the '609 Patent device functions, as it is precisely the recited incidence of the back surface cap member with a distal-facing end of the support beam that makes the back surface cap member "*shaped and dimensioned for positioning along the wall 120 of the cabinet 122 during the installation process*", *id.* at 7:44–46, when the

support bar is at "various *angular orientations*" relative to the cabinet wall, *id* at 7:55–56 (emphasis added). That claim 8 should be interpreted in light of this passage of the specification is further supported by the limitation, "a support bar *shaped and dimensioned for positioning* between an underside of the sink and a wall of a cabinet *at an angular orientation relative to the wall*", which clearly refers to the requirement that the second end be so "shaped and dimensioned" in the manner defined in the specification. *id.* at 9:40–45 (emphasis added). For this additional reason, the U-Mounts products do not infringe claim 8.

Alternatively, claim 8 is invalid for inadequate written description under 35 U.S.C. § 112(a), if construed not to require that the support beam of the second end extend to the back surface cap member in a distal direction (i.e., toward the lower end of the support bar), and thus that the back surface cap member curve to overlap a distal-facing end of the support beam. Without curving forwardly away from the rear side of the central support body in this manner, the back surface cap member would not be "shaped and dimensioned for positioning along the wall 120 of the cabinet 122 during the installation process", *id.* at 7:44–46, but would be spaced away from the wall, as is the second end of the U-Mounts product when installed at any non-parallel angle to a cabinet wall. The '609 Patent wholly lacks any descriptive support for generalizing away from the requirement that the back surface cap member be "shaped and dimensioned for positioning along the wall 120 of the cabinet 122". *See id.*

Because claim 8 of the '609 patent is either not infringed or invalid for inadequate written description, and because claims 9–13 each depend from claim 8 without narrowing the unsupported generalization that would result if claim 8 is construed not to require the back surface cap member curving to overlap a distal-facing end of the support beam, claims 9–13 are likewise either not infringed or invalid.

Claim 16 is either invalid for inadequate written description, invalid for indefiniteness, or not infringed under a proper construction of the text: "the second end of the support bar is angularly oriented relative to the central support body". *See id.* at 10:42–43. The written description of the '609 Patent as filed is inadequate with respect to this limitation. Nowhere does the '609 Patent as filed (i.e., U.S. Patent Application No. 14/095,461) refer to any part of the support bar being "angularly oriented" (or any equivalent thereof) relative to another part of the support bar, either in terms of an illustrated embodiment or an alternative shape. Rather, the second end of the support bar is only described as including a "curved" or "concave" portion, with no mention of any specific alternative shape or that "curved" or "concave" is an example of a genus or category of suitable shapes. Details of this curved or concave shape and its function are elaborated at length in the specification. *See* '609 Patent at 7:22–59, 8:23–35, 8:39–42. In view of the foregoing, claim 16 is invalid for inadequate written description with respect to this limitation.

Alternatively, claim 16 is invalid as indefinite, because the meaning of the limitation "the second end of the support bar is angularly oriented relative to the central support body" cannot be determined with reasonable certainty. See *Nautilus v. Biosig*, 572 U.S.__, 134 S. Ct. 2120 (2014) (holding that "[a] patent is invalid for indefiniteness if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.") Nothing in the specification provides a reference point from which it could be determined what angle or range of angles would satisfy this limitation, or between what feature (e.g., line, axis, surface) of the central support body and what feature of the second end of the support bar such angle or range of angles can be defined with reasonable certainty. *See id.*

Alternatively, even if claim 16 were adequately described and definite, the U-Mounts products would not infringe because they wholly lack a second end "angularly oriented" with respect to a central support body, as properly construed. If supported at all, this limitation must find its support in the "curved" or "concave" surface of a portion of the back surface cap member described in the specification. *See* '609 Patent at 7:22–59, 8:23–35, 8:39–42, FIGS. 16–18. Thus, "angularly oriented", to the extent it is amenable to any construction, should be construed as "having a back surface or side disposed at an angle relative to a back surface or side of". While generalizing far beyond the scope of what is fairly described in the '609 Patent as filed, this construction at least accords with the functional criterion that "[t]he *back* surface cap member 164 is ultimately shaped and dimensioned for positioning along the wall of the cabinet 122 during the installation process [i.e., with the support bar disposed at various angular orientations relative to the cabinet]". *Id.* at 7:44–46 (emphasis added). *See also id.* at 7:55–56. In view of the foregoing, even if claim 16 is found to be definite and adequately described, the U-Mounts products do not infringe claim 16 as properly construed.

Claims 17–23 of the '609 patent depend from Claim 16. Because claim 16 is invalid for inadequate written description and/or indefiniteness under 35 U.S.C. § 112, claims 17–23 are also invalid, as they comprise the same unsupported generalization from a "curved" back surface cap member or "concave" surface defined thereby to an "angularly oriented" second end. In any event, because the U–Mount does not infringe claim 16, the U-Mount cannot infringe claims 17–13.

In the event that the Court adopts a claim construction of the '609 Patent that could be infringed by the Defendant's U-Mounts products, then the '609 Patent is nonetheless invalid for obviousness over prior art on which the U-Mounts products are based. Specifically, it is common

in the granite installation business for an installer to shape a furring strip with a wedge cut and holes to allow for the upward thrust of the support against the sink flange when the screws are inserted into the cabinet wall ("Shaped Furring Strip"). In response to Defendant's interrogatory number 8, Plaintiff admitted that the Shaped Furring Strip is prior art to its alleged invention, stating that "Cinclips first became aware of using a 'furring strip' with an angled end *while researching and designing its Cinclips product*". Plaintiff's interrogatory response number 8 (emphasis added).

The U-Mounts products are nothing more than an injection molded plastic version of the Shaped Furring Strip. The only differences between the U-Mounts products and the furring strip that are actually recited in the Asserted Claims pertain to its symmetrical I-beam shape and its curved upper end, both of which are merely obvious design choices. An I-beam cross section saves a significant amount of material, with minimal loss of strength in bending,[3] as wide bands of material are retained in the cap members at the top and bottom of its bending cross section, where the greatest bending strain is felt. Likewise, the point need not be belabored that a curved upper end is obviously desirable in a bracing member to provide normal contact pressure at various angles. Thus, to the extent that they read on the U-Mounts products, the Asserted Claims the '609 patent are nonetheless invalid as obvious over the Shaped Furring Strip.

In addition, the '609 Patent should be held unenforceable for Plaintiff's inequitable conduct in failing to disclose the Shaped Furring Strip to the Patent Office. On May 14, 2015,

---

[3] . Incidentally, this is contrary to Cinclips' apparent misunderstanding that a solid rectangular cross section of the admitted prior art, having the same outer dimensions as an I-beam shape so as to fit within the same cabinet space, "do[es] not provide the strength" of an I-beam shape. An I-beam of the same outer dimensions as a rectangular beam may be substantially cheaper (assuming it is made of an easily shaped material) but is certainly somewhat weaker than the rectangular beam. An I-beam is stronger in bending than a rectangular beam of the same *mass* (or *volume* of material of a given density), but the outer dimensions of such an I-beam are also greater. If there is room between a sink and cabinet wall for an I-beam of such larger dimensions, there is also be room for a rectangular beam of such larger dimensions, which, likewise, would be *stronger*, though perhaps more expensive, than the larger dimensioned I-beam.

when Plaintiff first introduced new claim 33 (issued as claim 16 of the '609 Patent) to the '461 application that issued as the '609 Patent, reciting "the second end of the support bar is angularly oriented with respect to the support bar", Plaintiff was aware of the U-Mounts products and the Shaped Furring Strip, and would have readily understood that the U-Mounts products were simply an obvious plastic variation of the Shaped Furring Strip. Plaintiff nonetheless failed to disclose the Shaped Furring Strip to the Patent Office during prosecution of the '609 Patent, intentionally deceiving the Examiner in violation of its Rule 56 duty to disclose information material to patentability. . *See* 37 C.F.R. § 1.56. *See generally Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185 (Fed. Cir. 2014) (upholding a district court's finding that patents directed to a navigation system where unenforceable due to inequitable conduct because undisclosed operational details of the prior art were material to patentability)*; Therasense, Inc. v. Becton, Dickinson & Co*., 649 F.3d 1276 (Fed. Cir. 2011) (establishing the intent and "but-for" materiality standard for inequitable conduct). If not for Plaintiff's failure to disclose the Shaped Furring Strip to the Patent Office, the Asserted Claims of the '609 Patent would have been rejected on 35 U.S.C. § 103 obviousness grounds and would not have issued.

IV. **EXHIBIT LIST**

Plaintiff's Exhibit List is attached hereto as Exhibit A.

Defendant's Exhibit List is attached hereto as Exhibit B[4].

V. **WITNESS LIST**

---

[4] Plaintiff was only provided Defendant's exhibit list at the end of the day June 28, 2017 and has not had an opportunity to meaningfully review the exhibits because Plaintiff's counsel is on the road, notwithstanding that Plaintiff provided its exhibit list to Defendant on June 18, 2017.  Defendant has provided additional updates to its exhibit list today adding more exhibits for Plaintiff to consider. Defendant has agreed to give Plaintiff additional time to review Defendant's exhibit list to lodge its objections.  Notably, Defendant has produced a number of additional documents today and yesterday and included those additional documents on its exhibit list notwithstanding the close of discovery in February, 2017.

Plaintiff's Witness List is attached hereto as Exhibit C.

Defendant's Witness List is attached hereto as Exhibit D[5].

## VI.  EXPERT WITNESS LIST

Neither party identified any expert witnesses in accordance with Fed. R. Civ. P. 26.

## VII.  STATEMENT OF DAMAGES SOUGHT

Plaintiff will seek the full amount afforded to it under 35 U.S.C. § 284, including, but not limited to$110,000.00 in damages for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

## VIII.  DEPOSITIONS TO BE USED AT TRIAL

Plaintiff's deposition designations are attached hereto as Exhibit E.

Defendant intends to produce David Smith as a witness at trial and opposes the introduction of Plaintiff's designations of David Smith's deposition as evidence.  In the unlikely event that David Smith does not appear at trial, Defendant does not oppose Plaintiff introducing the portions of the deposition, with the exception of all designations referring to GoClips product sales and distribution on the grounds they are irrelevant (FRE 401), would be misleading and confusing to the jury (FRE 403), wasting time (FRE 403) and would be unduly prejudicical (FRE 403).  As Defendant's counter-designation will offer the balance of Mr. Smith's testimony contained in the deposition, with the exception of his testimony on his GoClips business.   Plaintiff objects to Defendant's wholesale designation of the entirety of a deposition transcript for failing to provide page and line numbers by which Plaintiff can analyze Defendant's designations.

## IX.  ADMITTING FACTS REQUIRING NO PROOF AT TRIAL

---

[5] Plaintiff was only provided Defendant's witness list at the end of the day June 28, 2017.  Plaintiff objects to the inclusion of witnesses not previously identified during discovery, including Mr. Kaiser, which Plaintiff has already sought to strike.

1.    Plaintiff is Georgia Limited Liability Company with its principal place of business in Atlanta, Georgia.

2.    Defendant is a Florida Limited Liability Company.

3.    Plaintiff is the owner of all right, title and interest in the '609 Patent.

4.    The '609 Patent was granted on September 15, 2015, naming inventor Dow Blaine for an invention entitled "Mounting Driver for Undermounted Sinks."

5.    Plaintiff has recorded its ownership of the '609 Patent with the United States Patent and Trademark Office.

6.    U.S. Patent No. 9,637,898 ("the '898 Patent") was granted on May 2, 2017, naming inventor Dow Blaine for an invention entitled "Mounting Driver for Undermounted Sinks."

7.    Plaintiff has recorded its ownership of the '898 Patent with the United States Patent and Trademark Office.

8.    Dow Blaine is the inventor of the '609 Patent.  U.S. Patent Application No. 14/095,461 ("the '461 application") was filed on December 3, 2013, and issued as the '609 Patent on September 15, 2015.

9.    Dow Blaine is the inventor of the '898 Patent.  U.S. Patent Application No. 15/072,683 ("the '683 application") was filed on March 17, 2016 and issued as the '898 Patent on May 2, 2017.

10.    The '683 application is a continuation of U.S. Patent Application No. 14/812,424 ("the '424 application"), filed July 29, 2015, now U.S. Pat. No. 9,290,919 ("the '919 Patent"), which is a continuation in part of the '461 application.

11.    Plaintiff sent Defendant a letter informing it of the '609 Patent on March 18, 2016, which Defendant received.

12.     Plaintiff sent Defendant a letter informing it of the '898 Patent on May 13, 2017, which Defendant received.

13.     Dow Blaine sent David Smith a text message on January 28, 2015.  David Smith replied to the text message.

14.     The '461 application that matured into the '609 Patent published on April 23, 2015.

## X.     AGREED APPLICABLE PRINCIPLES OF LAW

Plaintiff has the burden to prove infringement by a preponderance of the evidence, which requires proving that infringement was more likely than not to have occurred.  *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326 (Fed. Cir. 2005).

An infringement analysis is a two step process.  *See e.g. Schindler Elevator Corp. v. Otis Elevator Corp.*, 593 F.3d 1275, 1281 (Fed. Cir. 2010).  The first step is the construction of the patent claims at issue.  *Id*.  The second step is a comparison of the allegedly infringing product to the construed claims.  *Id*. A party is liable for patent infringement even if it infringes only a single patent claim.  *Panduit Corp. v. Dennison Mfg. Co.,* 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987).

Infringement is not avoided merely by the accused device having extra parts, ingredients, or steps, respectively, to those claimed.  *Dow Chem. Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1380-81 (Fed. Cir. 2001); *Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 811 (Fed. Cir. 1999).  An accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation.  *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, 1343 (Fed. Cir. 2001).

A plaintiff may seek to prove literal or infringement under the doctrine of equivalents. *Pro Tech Monitoring, Inc. v. Satellite Tracking of People, LLC,* No. 808-CV-1455-T-30AEP, 2010 WL 55567, at *5 (M.D. Fla. Jan. 4, 2010). "To establish literal infringement, all of the elements

of the claim, as correctly construed, must be present in the accused system." *Id*. "Under the doctrine of equivalents, 'a product … that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is equivalence between the elements of the accused product … and the claimed elements of the patented invention." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1357 (Fed. Cir. 2005) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem., Co.*, 520 U.S. 17, 21 (1997)). "Under the insubstantial differences test, '[a]n element in the accused device is equivalent to a claim limitation only if the only differences between the two are insubstantial.'" *Voda v Codis Cop.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (quoting *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004)). Alternatively, equivalence may be shown "by showing on an element-by-element basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product, often referred to as the function-way-result test." *Intendis GMBH v. Glenmark Pharmaceuticals Inc*. 822 F.3d 1355, 1360-61 (Fed. Cir. 2016).

In some cases of infringement, the plaintiff is entitled to enhanced damages due to willful infringement. Assessing enhanced damages is a two-step process: (1) fact finder must make factual finding of willful infringement; and (2) the court then decides if the totality of the circumstances justifies enhanced damages. *See Hako-Med USA, Inc. v. Axiom Worldwide, Inc.*, 2009 WL 3064800 at *2 (M.D. Fla. Sept. 22, 2009) (Covington, J.)

A patent is presumed valid. 35 U.S.C. § 282. Defendant has the burden of establishing invalidity through clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

To establish invalidity on obviousness grounds, Defendant must demonstrate that the subject matter of the Asserted Claims "would have been obvious at the time the invention was made to a person of ordinary skill in the art to which the subject matter of the invention pertains." 35 U.S.C. § 103(a). In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Court set out a framework for applying the statutory language of 35 U.S.C. § 103:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Id*. at 17-18. "While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls." *KSR Int'l. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007).

Obviousness requires more than mere conclusory allegations: "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbot Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citations and quotations omitted). Analyzing obviousness is a two-step inquiry. *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003). The first step is a proper construction of the claims by the court. *Id*. The second step is a comparison of the construed claims to the prior art. *Id*.

To qualify as prior art, a reference must have been patented, described in a printed publication, or in public use, on sale, or otherwise available to the public anywhere in the world before the effective filing date of the challenged patent. *See* 35 U.S.C. § 102. A disclosure shall not be prior art if the subject matter disclosed was obtained directly or indirectly from the inventor of the challenged patent. *Id*.

## XI.    ISSUES OF FACT TO BE LITIGATED[6]

1.    Whether Defendant infringes the '609 Patent through any of its alleged activities with respect to the U-Mounts products.

2.    If Defendant infringes the '609 Patent, whether Defendant's infringement was willful.

3.    Whether the Asserted Claims of the '609 Patent are invalid for obviousness over the prior art under 35 U.S.C. § 103.

4.    Whether the Asserted Claims of the '609 Patent are invalid for inadequacy of written description or indefiniteness under 35 U.S.C. § 112(a).

5.    If any claim of the '609 Patent is found to be infringed and not invalid, what damages, if any, Plaintiff is entitled to recover from Defendant.

6.    Whether Defendant offers for sale U-Mounts[7].

7.    Whether Defendant sells U-Mounts[8].

8.    Whether Defendant imports U-Mounts[9].

9.    Whether Defendant has made 55,000 U-Mounts.

10.    Whether Defendant has imported 55,000 U-Mounts.

11.    Whether Defendant has sold 53,255 U-Mounts.

12.    Whether Defendant has given away 1,745 U-Mounts.

---

[6] Plaintiff was not given an adequate opportunity to review Defendant's proposed list of additional facts to litigate (items number 14-63 below) and thus reserves its objections to the extent permissible.
[7] Defendant has already admitted this fact.  *See* Defendant's Response to First Requests for Admissions, Admission No. 2, attached here as Exhibit F
[8] Defendant has already admitted this fact.  *See* Defendant's Response to First Requests for Admissions, Admission No. 3, attached here as Exhibit F.
[9] Defendant has already admitted this fact.  *See* Defendant's Response to First Requests for Admissions, Admission No. 5, attached here as Exhibit F

13.     Whether Defendant's revenues from sales of U-Mounts, both as originally designed and as redesigned, is $39,045.63.

14.     Whether the '898 Patent specification includes additional drawing figures 19-24, substantial changes to the "SUMMARY OF THE INVENTION" section at columns 1–2, new text describing FIGS. 19–24 at 2:57 – 3:2, and new text describing "yet another embodiment" with reference to FIGS. 19–24 at 8:45 – 10:2.

15.     Whether Defendant has redesigned an undermount sink brace product that it sold under the name U-Mounts ("original U-Mounts product") to fill a hole in an end portion near a lower end thereof, resulting in a redesigned U-Mounts product with only two screw holes, each of the two screw holes disposed at the same distance from the lower end of the redesigned U-Mounts product ("redesigned U-Mounts product").

16.     Whether Dow Blaine's text message to David Smith establishes that Blaine became aware of Defendant's original U-Mounts products no later than January 28, 2015.

17.     Whether the claims of the '461 application were amended on May 14, 2015, submitting for the first time claims to a one-piece mounting driver without a requirement of a curved back surface cap member, as new claims then numbered 25 and 33, corresponding to issued claims 8 and 16 of the '609 Patent.

18.     Whether new claim 33 submitted in the '461 application on May 14, 2015 included the first reference in the '609 Patent file history to a second end of a support bar being "angularly oriented" with respect to a central support body of the support bar.

19.     Whether the '609 Patent claims the benefit of U.S. provisional patent application No. 61/894,748 ("provisional application"), filed on October 23, 2013.

20.     Whether the '609 Patent includes additional drawing figures 16–18 (illustrating a one-piece "mounting driver 110") and text additions not found in the provisional application, at 2:22–35; 3:10–12; 3:67 – 4:1 ("Both the support bar 16 and the mounting bracket 42 are preferably injection molded."); 4:1–2 ("a rigid" in place of "an"); 4:50–51 ("lateral" and "a plane tangent"); 5:19 ("of rigid construction and has a"); 5:42 ("is prevented", and "is enhanced" in place of "are further enhanced"); and 6:38 – 8:47 (description of one-piece mounting driver 110).

21.     Whether the two screw holes of the redesigned U-Mounts product are formed in a line perpendicular to a length direction of a lower end portion of the redesigned U-Mounts product.

22.     Whether the two screw holes of the redesigned U-Mounts product are formed in a line perpendicular to an axial direction defined by an axis of the U-Mounts product.

23.     Whether the screw holes of the original and redesigned U-Mounts products (collectively, "U-Mounts products") are cylindrical holes having parallel axes.

24.     Whether substantially an entire rear face of the U-Mounts products is planar.

25.     Whether a lower portion of a front face opposite the rear face of the U-Mounts products is inclined obliquely with respect to the rear face of the U-Mounts products.

26.     Whether a lower portion of the front face of the U-Mounts products is inclined away from the rear face of the U-Mounts products in an direction extending from the lower end to an upper end of the U-Mounts products.

27.     Whether the lower portion of the front face of the U-Mounts products bears the word "SCREWS".

28.     Whether the parallel axes of the holes of the original and redesigned U-Mounts are inclined at an upward angle with respect to a cabinet wall when a first end of the U-Mounts

products is pressed against an underside of a sink and a distal end of the U-Mounts products is secured to the cabinet wall by a plurality of mounting screws inserted at the upward angle through a front side of a second end of the U-Mounts products, the front side of the second end portion being obliquely inclined with respect to a substantially entirely planar rear face of the U-Mounts products.

29.     Whether Defendant sold the original U-Mounts products together with two mounting screws for each U-Mounts product unit sold.

30.     Whether Plaintiff's counsel ordered a shipment of original U-Mounts products prior to filing suit.

31.     Whether Plaintiff's counsel received the shipment of original U-Mounts products prior to filing suit.

32.     Whether the shipment of original U-Mounts products received by Plaintiff's counsel prior to filing the lawsuit included two mounting screws for each original U-Mounts product unit in the shipment.

33.     Whether the function of a "plurality of screw holes formed along the length of the second end of the support bar", as recited in '609 Patent claims 8 and 16, is to "allow for various angular orientations of the support bar [] during installation while simultaneously permitting an installer to drive the screws straight into the wall [] of the cabinet []". '609 Patent at 7:55–59.

34.     Whether Defendant has never sold U-Mounts products together with a sink or cabinet.

35.     Whether Defendant has never sold U-Mounts products already installed in a sink cabinet.

36.     Whether Defendant has never sold U-Mounts products having a second end of a support bar of the U-Mounts products rigidly secured to the wall of a sink cabinet.

37.     Whether A first end of a support bar of a U-Mounts product being pressed against the underside of a sink does not inherently cause a second end of the support bar to be rigidly secured to the wall of a cabinet.

38.     Whether Defendant has ever sold the U-Mounts products wherein with a first end of a support bar of the U-Mounts products pressed against the underside of a sink, a second end of a support bar of the U-Mounts products is rigidly secured to a wall of a cabinet.

39.     Whether neither the original nor the redesigned U-Mounts products includes a plurality of screw holes formed in a line matching a length direction of a second end of the U-Mounts products.

40.     Whether neither the original nor the redesigned U-Mounts products includes a plurality of screw holes formed in a line matching the direction of an axis of a central support body or an axis of a support bar of the U-Mounts products.

41.     Whether neither the original nor the redesigned U-Mounts products includes a plurality of screw holes formed along the length of a second of the U-Mounts products.

42.     Whether the redesigned U-Mounts products wholly lack screw holes formed at different positions with respect to a length direction of a second end of the redesigned U-Mounts products.

43.     Whether teither the original nor the redesigned U-Mounts products comprises a second end of a support bar including a support beam extending therealong from a central support body to a distal end and a back surface cap member.

44.     Whether a purported support beam of the U-Mounts products does not extend along the length of the second end and instead terminates prior the position of a third hole of the original U-Mounts products and a filled-in hole of the redesigned U-Mounts products.

45.     Alternatively, whether a purported support beam of the U-Mounts products terminates where inner surfaces of a purported front surface cap member and a purported back surface cap member meet, at a location displaced at a distance from a distal end of the U-Mounts products.

46.     Whether the '461 application as filed does not contain the phrase "angularly oriented".

47.     Whether the '461 application as filed does not use any inflectional form of the root word "angle" to refer to or describe an orientation of a second end of a support bar relative to a central support body.

48.     Whether the '461 application as filed does not use any synonym of the word "angle" to refer to or describe an orientation of a second end of a support bar relative to a central support body.

49.     Whether the '461 application as filed uses the terms "curved", "curvature," "radius of curvature", "concave", and "central axis" eight times to refer to the shape of "second end 146" or features thereof. *See* '609 Patent at 7:25, 7:30, 7:43, 7:47, 7:48, 7:49, 8:27, 8:30–31.

50.     Whether the sole independent claim of the '461 application as filed that is directed to a one-piece mounting driver, namely, claim 17, recites, "the second end of the support bar is curved such that a back surface cap member of the support bar defines a concave surface along a back side of the support bar".

51. Whether the '609 Patent states, "While a series of spaced holes are disclosed in accordance with a preferred embodiment, it is appreciated a slot might also be employed to provide for versatility in the positioning of the support arm during installation". '609 Patent at 8:10–14.

52. Whether the '461 application as filed does not state a genus or category of shapes that might be employed for second end 146 of support bar 116, of which "curved" is a species or member.

53. Whether the '461 application as filed does not state a specific alternative to a "curved" shape that might also be employed for second end 146 of support bar 116.

54. Whether the '461 application as filed does not state a genus or category of shapes that might be employed for "concave surface 167" (numeral "167" omitted from '609 Patent drawings) defined by back surface cap member 164 along the "back side 116b" (numeral "116b" omitted from '609 Patent drawings) of the support bar 116, of which "concave" is a species or member. *See, e.g.,* '609 Patent at 7:41–44.

55. Whether the '461 application as filed does not state a specific alternative to a "concave" shape that might also be employed for a surface 167 defined by back surface cap member 164 along a back side 116b of support bar 116.

56. Whether the '461 application as filed states, "the second end 146 of the support bar 116 . . . exhibits a curvature. . ."

57. Whether the '461 application as filed does not refer to a second end of a support bar being "angularly oriented" relative to a central support body.

58.     Whether neither the original nor the redesigned U-Mounts products comprise a second end of the support bar having a surface defined by a back surface cap member that is angularly oriented relative to the central support body.

59.     Whether neither the original nor the redesigned U-Mounts products comprise a back side of a support bar that is angularly oriented relative to a central support body at a lower end of the support bar in which screw holes are formed.

60.     Whether Defendant sells redesigned U-Mounts products.

61.     Whether Defendant imports redesigned U-Mounts products.

62.     Whether Defendant manufactures redesigned U-Mounts products.


## XII.     ISSUES OF LAW ON WHICH THE PARTIES DO NOT AGREE AND ARE TO BE DETERMINED BY THE COURT

Plaintiff has not been given an adequate opportunity to review Defendant's legal position below.  Plaintiff expects the parties should be able to meet and confer to resolve any differences in the interpretation of law and present those differences in an appropriate filing for the Court. Defendant's statement of legal issues is below.

A specification of a patent as filed must "contain a written description of the invention." 35 U.S.C. § 112(a). A specification has an adequate written description only when it "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date" of the patent. *Rivera v. ITC*, 2017 U.S. App. LEXIS 8931, *8, No. 2016-1841 (Fed. Cir. May 23, 2017), *citing Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Adequacy of written description is a question of fact. *Id.* "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art . . . . [to] show that the inventor actually invented the invention claimed."

*Id.*, *quoting Ariad*, 598 F.3d at 1351. A generic claim that extends beyond what the specification "reasonably conveys to those skilled in the art that the inventor had possession of", results in a claim that is invalid for indefiniteness. *See LizardTech, Inc. v. EarthRes. Mapping, Inc.*, 424 F.3d 1336, 1345–47 (Fed. Cir. 2005) (affirming a the district court's holding that, where a patent specification provided "only one method for creating a seamless DWT [discrete wavelet transform], which is to 'maintain updated sums' of DWT coefficients", a claim that "refers to taking a seamless DWT generically" without a "maintain updated sums" limitation was invalid for inadequate written description).

Section 112 of the Patent Act also requires the patent applicant to conclude the specification with "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention", which is known as the "definiteness" requirement. *See* 35 U. S. C. § 112(b).

In *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014), the Supreme Court rejected the Federal Circuit's "insolubly ambiguous" standard, finding that this formulation "does not satisfy the statute's definiteness requirement. Instead, the Supreme Court ruled that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with *reasonable certainty*, those skilled in the art about the scope of the invention." *Nautilus* at 2124 (emphasis added). Definiteness is to be evaluated from the perspective of someone skilled in the relevant art. *Id*. at 2128. In addition, when assessing definiteness, "claims are to be read in light of the patent's specification and prosecution history." *Id*.

"Absent a meaningful definiteness check, . . . patent applicants face powerful incentives to inject ambiguity into their claims." *Id*. at 1229. The Supreme Court found that "eliminating that

temptation is in order", concluding that the Federal Circuit's formulation of asking only whether the claims were amenable to construction or insolubly ambiguous "can breed lower court confusion for they lack the precision that section 112 demands". *Id*. at 1230. The court further noted that "To tolerate imprecision just short of that rendering a claim "insolubly ambiguous" would diminish the definiteness requirement's public-notice function and foster the innovation-discouraging "zone of uncertainty". *Id*.


XIII.  **DISAGREEMENTS AS TO THE APPLICATION OF FEDERAL RULES OF EVIDENCE OR FEDERAL RULES OF CIVIL PROCEDURE**

To the extent that disagreements arise, the parties will file motions in limine three weeks before the trial term.

XIV.  **MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT**

1.  Claim Construction [Dkts. 33, 35, 36]

2.  Plaintiff's Motion for Summary Judgment [Dkts. 54, 59, 66]

3.  Plaintiff's Motion to Strike Untimely Disclosed Witness [Dkt.63, 67]


June 30, 2017

*/s/ Woodrow H. Pollack*                         */s/*
Woodrow H. Pollack                              Chuck Geitner
Florida Bar No. 26802                           Florida Bar No. 085170
Greenberg Traurig, LLP                          Hinshaw and Culbertson, LLP
101 E Kennedy Blvd, Suite 1900                  100 S. Ashley Drive, Suite 500
Tampa, FL 33602                                 Tampa, FL 33602
(813) 318-5700                                  (813) 276-1662
(813) 318-5900 (facsimile)                      (813) 276-1956
pollackw@gtlaw.com                              cgeitner@hinshawlaw.com
*Attorney for Plaintiff*                        *Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on <u>June 30, 2017</u> a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<u>*/s/ Woodrow H. Pollack*</u>
Woodrow H. Pollack