# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| CINCLIPS, LLC,<br>   a Georgia Limited Liability Company<br><br>Plaintiff,<br><br>v.<br><br>Z KEEPERS, LLC,<br>   a Florida Limited Liability Company,<br><br>Defendant. | Civil Action No. 8:16-cv-01067-SDM0JSS |

## **DEFENDANTS PRELIMINARY TRIAL BRIEF**

Defendant, Z Keepers, LLC ("Defendant") files preliminary[1] Trial Brief, in keeping with with the Case Management Scheduling Order [DE 101].

### I. DEFENDANT'S GENERAL STATEMENT OF THE CASE

The '609 Patent is directed to a "Mounting Driver for Undermounted Sinks." Plaintiff and Defendant are competitors in the sink support industry and offer competing solutions for supporting an undermounted sink. Defendant's undermount sink support does not infringe Claims 8-13 and 16-20 (the "Asserted Claims") of the '609 Patent. Defendant's development of its undermount sink support (the "U-Mount") is Defendant's plastic version of a furring strip which Defendant's principal, David Smith, used for many years installing undermount sinks in residences

---

[1] Defendant has a pending request to Plaintiff through its counsel for a one day extension for Defendant to file its Trial Brief, due to the undersigned's belief that the Trial Brief was to be a joint effort, and Plaintiff's notice earlier this evening that Plaintiff would file a separate trial brief without conferring with Defendant on its contents. In an abundance of caution, Defendant files this preliminary version intending to amend it upon Plaintiff's counsel's response to the undersigned's request for the one day extension of time.

1

prior to Plaintiff seeking patent protection for Plaintiff's Cinclips product. Defendant's sale of its U-mounts is therefore lawful competition.

To infringe any of the Asserted Claims, the mounting driver must include a support bar having a first end shaped and dimensioned to engage the underside of the sink and a second end with a "plurality of screw holes formed along the length of the second end". '609 Patent claims 8 and 16. The '609 patent's specification further explain the purpose of this feature which is that the plurality of screw holes formed along the length of the second allows for the support bar to be positioned such that one of the sets of screw holes formed along the length can be perpendicularly screwed into the cabinet wall. The figure accompanying the claims and the specification depict a second end with multiple sets of screw holes along the length of a curved second end. Neither Defendant's original U-mounts products nor its redesigned U-mounts products include a plurality of screw holes formed along the length of the second end. Moreover Defendant's U-Mount does not permit the perpendicular insertion of screws into the cabinet wall no matter which angle it is installed at. Instead the U-mounts product is designed to receive mounting screws inserted at an upward angle, so that as the mounting screws are installed, the first end of the support presses more firmly against the sink, unlike Plaintiff's perpendicular application.

In addition, the Asserted Claims all require that "with the first end of the support bar pressed against the underside of the sink, the second end of the support bar *is rigidly secured* to the wall of the cabinet." *Id.* (emphasis added). Neither Defendant's original U-mounts products nor its redesigned U-mounts products are manufactured, sold, or imported in a state of being rigidly secured to the wall of a cabinet, nor does Defendant install its U-mounts products, nor does pressing a U-mounts product against the underside of a sink inherently result in the second end of the support bar being rigidly secured to the wall of an adjacent cabinet. The phrase "is rigidly

secured" plainly affirmatively requires either a rigidly secured state of the second end of the support bar, or that, as a characteristic of the support bar, such a rigidly secured state be inherently attained when the first end is pressed against the underside of the sink. This is particularly clear given the use of the phrases "dimensioned to engage", "for the passage of a mounting screw", and "for positioning" in the Asserted Claims, which demonstrates that, when it wanted to, the '609 Patentee knew how to recite relational functionality as a characteristic of a claimed structural element, without affirmatively requiring that the relational function be carried out. Thus, Defendant does not infringe claim 8 or claim 16, even assuming *arguendo* that claim 8 or claim 16 reads on the U-mounts products installed in a sink cabinet, which neither does.

Claim 8 further requires "a support beam extending [along the second end of the support bar] from the central support body to a distal end and a back surface cap member." Defendant's U-mounts products do not include this element, both because what Plaintiff has identified as a support beam of the second end of the U-mounts products terminates before a distal end, and because, in a direction toward the distal end, the purported support beam extends *parallel to* a back surface cap member, not *to* a back surface cap member. It is precisely the incidence of the back surface cap member with a distal-facing end of the support beam, recited in claim 8,that makes the back surface cap member "*shaped and dimensioned for positioning along the wall* 120 of the cabinet 122 during the installation process", *id.* at 7:44–46, when the support bar is at "various *angular orientations*" relative to the cabinet wall, *id* at 7:55–56 (emphasis added). Further support for interpreting claim 8 in light of this passage of the specification is found in the limitation, "a support bar *shaped and dimensioned for positioning* between an underside of the sink and a wall of a cabinet *at an angular orientation relative to the wall*", which clearly refers to the requirement that the second end be "shaped and dimensioned" in the manner defined in the

specification. *id.* at 9:40–45 (emphasis added). For this additional reason, the U-mounts products do not infringe claim 8.

Alternatively, claim 8 is invalid for inadequate written description under 35 U.S.C. § 112(a), if its plain and ordinary meaning is read not to require that the support beam of the second end extend to the back surface cap member in a distal direction (i.e., toward the lower end of the support bar), and thus that the back surface cap member curve to overlap a distal-facing end of the support beam. Without curving forwardly away from the rear side of the central support body in this manner, the back surface cap member would not be "shaped and dimensioned for positioning along the wall 120 of the cabinet 122 during the installation process", *id.* at 7:44–46, but would be spaced away from the wall, as is the second end of the U-mounts product when installed at any non-parallel angle to a cabinet wall. The '609 Patent wholly lacks any descriptive support for generalizing away from the requirement that the back surface cap member be "shaped and dimensioned for positioning along the wall 120 of the cabinet 122". *See id.*

Because claim 8 of the '609 patent is either not infringed or invalid for inadequate written description, and because claims 9–13 each depend from claim 8 without narrowing the unsupported generalization that would result if the plain and ordinary meaning of claim 8 is read not to require the back surface cap member curving to overlap a distal-facing end of the support beam, claims 9–13 are likewise either not infringed or invalid.

Claim 16 is either invalid for inadequate written description or not infringed under any plausible reading of the text: "the second end of the support bar is angularly oriented relative to the central support body". *See id.* at 10:42–43. That is, the written description of the '609 Patent as filed is inadequate with respect to this limitation, insofar as it is construed, or its plain and ordinary meaning read, to cover the accused U-mounts device. Nowhere does the '609 Patent as

filed (i.e., U.S. Patent Application No. 14/095,461) refer to any part of the support bar being "angularly oriented" (or any equivalent thereof) relative to another part of the support bar, either in terms of an illustrated embodiment or an alternative shape. Rather, the second end of the support bar is only described as including a "curved" or "concave" portion, with no mention of any specific alternative shape or that "curved" or "concave" is an example of a genus or category of suitable shapes. Details of this curved or concave shape and its function are elaborated at length in the specification. *See* '609 Patent at 7:22–59, 8:23–35, 8:39–42. In view of the foregoing, claim 16 is invalid for inadequate written description with respect to this limitation, read to cover a device that wholly lacks a second end including a curved or "concave" (convex) portion.

Alternatively, even if the subject matter of claim 16 were adequately described in the '609 patent specification, the U-mounts products would not infringe because they wholly lack a second end "angularly oriented" with respect to a central support body, under any reading of claim 16 that would find such written description support. That is, if supported at all, this limitation must find its support in the "curved" or "concave" surface of a portion of the back surface cap member described in the specification. *See* '609 Patent at 7:22–59, 8:23–35, 8:39–42, FIGS. 16–18. Thus, "angularly oriented", to the extent it is amenable to any construction, should be construed as "having a back surface or side disposed at an angle relative to a back surface or side of". While generalizing far beyond the scope of what is fairly described in the '609 Patent as filed, this construction at least accords with the functional criterion that "[t]he *back* surface cap member 164 is ultimately shaped and dimensioned for positioning along the wall of the cabinet 122 during the installation process [i.e., with the support bar disposed at various angular orientations relative to the cabinet]". *Id.* at 7:44–46 (emphasis added). *See also id.* at 7:55–56. In view of the foregoing,

5

even if claim 16 is found to be definite and adequately described, the U-mounts products do not infringe claim 16 as properly construed.

Claims 17–23 of the '609 patent depend from Claim 16. Because claim 16 is invalid for inadequate written description, claims 17–23 are also invalid, as they comprise the same unsupported generalization from a "curved" back surface cap member or "concave" surface defined thereby to an "angularly oriented" second end. In any event, because the U–Mount does not infringe claim 16, the U-Mount cannot infringe claims 17–13.

In the event that the Court adopts a claim construction of the '609 Patent that could be infringed by the Defendant's U-mounts products, then the '609 Patent is nonetheless invalid for obviousness over prior art on which the U-mounts products are based. Specifically, it is common in the granite installation business for an installer to shape a furring strip with a wedge cut and holes to allow for the upward thrust of the support against the sink flange when the screws are inserted into the cabinet wall ("Shaped Furring Strip"). In response to Defendant's interrogatory number 8, Plaintiff admitted that the Shaped Furring Strip is prior art to its alleged invention, stating that "Cinclips first became aware of using a 'furring strip' with an angled end *while researching and designing its Cinclips product*". Plaintiff's interrogatory response number 8 (emphasis added).

The U-mounts products are nothing more than an injection molded plastic version of the Shaped Furring Strip. The only differences between the U-mounts products and the furring strip that are actually recited in the Asserted Claims pertain to its symmetrical I-beam shape and its curved upper end, both of which are merely obvious design choices. An I-beam cross section saves a significant amount of material, with minimal loss of strength in bending as wide bands of material are retained in the cap members at the top and bottom of its bending cross section, where

the greatest bending strain is felt. Likewise, the point need not be belabored that a curved upper end is obviously desirable in a bracing member to provide normal contact pressure at various angles. Thus, to the extent that they read on the U-mounts products, the Asserted Claims the '609 patent are nonetheless invalid as obvious over the Shaped Furring Strip.

In addition, the '609 Patent should be held unenforceable for Plaintiff's inequitable conduct in failing to disclose the Shaped Furring Strip to the Patent Office. On May 14, 2015, when Plaintiff first introduced new claim 33 (issued as claim 16 of the '609 Patent) to the '461 application that issued as the '609 Patent, reciting "the second end of the support bar is angularly oriented with respect to the support bar", Plaintiff was aware of the U-mounts products and the Shaped Furring Strip, and would have readily understood that the U-mounts products were simply an obvious plastic variation of the Shaped Furring Strip. Plaintiff nonetheless failed to disclose the Shaped Furring Strip to the Patent Office during prosecution of the '609 Patent, intentionally deceiving the Examiner in violation of its Rule 56 duty to disclose information material to patentability. . *See* 37 C.F.R. § 1.56. *See generally Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185 (Fed. Cir. 2014) (upholding a district court's finding that patents directed to a navigation system where unenforceable due to inequitable conduct because undisclosed operational details of the prior art were material to patentability)*; Therasense, Inc. v. Becton, Dickinson & Co*., 649 F.3d 1276 (Fed. Cir. 2011) (establishing the intent and "but-for" materiality standard for inequitable conduct). If not for Plaintiff's failure to disclose the Shaped Furring Strip to the Patent Office, the Asserted Claims of the '609 Patent would have been rejected on 35 U.S.C. § 103 obviousness grounds and would not have issued.

## II. AGREED APPLICABLE PRINCIPLES OF LAW

Plaintiff has the burden to prove infringement by a preponderance of the evidence, which requires proving that infringement was more likely than not to have occurred. *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326 (Fed. Cir. 2005).

An infringement analysis is a two step process. *See e.g. Schindler Elevator Corp. v. Otis Elevator Corp.*, 593 F.3d 1275, 1281 (Fed. Cir. 2010). The first step is the construction of the patent claims at issue. *Id.* The second step is a comparison of the allegedly infringing product to the construed claims. *Id.* A party is liable for patent infringement even if it infringes only a single patent claim. *Panduit Corp. v. Dennison Mfg. Co.,* 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987).

Infringement is not avoided merely by the accused device having extra parts, ingredients, or steps, respectively, to those claimed. *Dow Chem. Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1380-81 (Fed. Cir. 2001); *Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 811 (Fed. Cir. 1999). An accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation. *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, 1343 (Fed. Cir. 2001).

A plaintiff may seek to prove literal or infringement under the doctrine of equivalents. *Pro Tech Monitoring, Inc. v. Satellite Tracking of People, LLC,* No. 808-CV-1455-T-30AEP, 2010 WL 55567, at *5 (M.D. Fla. Jan. 4, 2010). "To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system." *Id.* "Under the doctrine of equivalents, 'a product … that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is equivalence between the elements of the accused product … and the claimed elements of the patented invention." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1357 (Fed. Cir. 2005) (quoting *Warner-Jenkinson Co. v.*

*Hilton Davis Chem., Co.*, 520 U.S. 17, 21 (1997)). "Under the insubstantial differences test, '[a]n element in the accused device is equivalent to a claim limitation only if the only differences between the two are insubstantial.'" *Voda v Codis Cop.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (quoting *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004)). Alternatively, equivalence may be shown "by showing on an element-by-element basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product, often referred to as the function-way-result test." *Intendis GMBH v. Glenmark Pharmaceuticals Inc*. 822 F.3d 1355, 1360-61 (Fed. Cir. 2016).

In some cases of infringement, the plaintiff is entitled to enhanced damages due to willful infringement. Assessing enhanced damages is a two-step process: (1) fact finder must make factual finding of willful infringement; and (2) the court then decides if the totality of the circumstances justifies enhanced damages. *See Hako-Med USA, Inc. v. Axiom Worldwide, Inc.*, 2009 WL 3064800 at *2 (M.D. Fla. Sept. 22, 2009) (Covington, J.)

A patent is presumed valid. 35 U.S.C. § 282. Defendant has the burden of establishing invalidity through clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

To establish invalidity on obviousness grounds, Defendant must demonstrate that the subject matter of the Asserted Claims "would have been obvious at the time the invention was made to a person of ordinary skill in the art to which the subject matter of the invention pertains." 35 U.S.C. § 103(a). In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Court set out a framework for applying the statutory language of 35 U.S.C. § 103:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue

9

> are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Id*. at 17-18. "While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls." *KSR Int'l. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007).

Obviousness requires "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbot Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citations and quotations omitted). Analyzing obviousness is a two-step inquiry. *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003). The first step is a proper construction of the claims by the court. *Id*. The second step is a comparison of the construed claims to the prior art. *Id*.

To qualify as prior art, a reference must have been patented, described in a printed publication, or in public use, on sale, or otherwise available to the public anywhere in the world before the effective filing date of the challenged patent. *See* 35 U.S.C. § 102. A disclosure shall not be prior art if the subject matter disclosed was obtained directly or indirectly from the inventor of the challenged patent. *Id*.

### III. ISSUES OF FACT TO BE LITIGATED

1. Whether Defendant's U-Mounts product infringes claims 8 and 16 the '609 Patent.

2. If Defendant's U-Mounts product infringes claim 8 or claim 16 of the '609 Patent, whether Defendant's infringement of such claim was willful, given that Defendant began manufacture of a three-hole version of its U-mounts product in August 2014, and upon being notified of Plaintiff's position that the U-Mounts product infringed the '609 patent, promptly obtained opinion of counsel that the asserted '609 patent claims were invalid, or in the alternative,

that its U-Mounts product did not infringe any valid claim of the '609 patent, and later redesigned its U-Mounts product to be further differentiate it from the asserted claims of the '609 patent..

3. Whether the Asserted Claims of the '609 Patent are invalid for obviousness over the prior art under 35 U.S.C. § 103.

4. Whether the Asserted Claims of the '609 Patent are invalid for inadequacy of written description under 35 U.S.C. § 112(a).

5. If any claim of the '609 Patent is found to be infringed and not invalid, what damages, if any, Plaintiff is entitled to recover from Defendant.

6. Whether Defendant has redesigned an undermount sink brace product that it sold under the name U-mounts ("original U-mounts product") to fill a hole in an end portion near a lower end thereof, resulting in a redesigned U-mounts product with only two screw holes, each of the two screw holes disposed at the same distance from the lower end of the redesigned U-mounts product ("redesigned U-mounts product").

7. Whether Dow Blaine's text message to David Smith establishes that Blaine became aware of Defendant's original U-mounts products no later than January 28, 2015.

8. Whether the claims of the '461 application were amended on May 14, 2015, submitting for the first time claims to a one-piece mounting driver without a requirement of a curved back surface cap member, as new claims then numbered 25 and 33, corresponding to issued claims 8 and 16 of the '609 Patent.

9. Whether new claim 33 submitted in the '461 application on May 14, 2015 included the first reference in the '609 Patent file history to a second end of a support bar being "angularly oriented" with respect to a central support body of the support bar.

10. Whether the '609 Patent includes additional drawing figures 16–18 (illustrating a one-piece "mounting driver 110") and text additions not found in the provisional application, at 2:22–35; 3:10–12; 3:67 – 4:1 ("Both the support bar 16 and the mounting bracket 42 are preferably injection molded."); 4:1–2 ("a rigid" in place of "an"); 4:50–51 ("lateral" and "a plane tangent"); 5:19 ("of rigid construction and has a"); 5:42 ("is prevented", and "is enhanced" in place of "are further enhanced"); and 6:38 – 8:47 (description of one-piece mounting driver 110).

11. Whether the two screw holes of the redesigned U-mounts product are formed in a line perpendicular to a length direction of a lower end portion of the redesigned U-mounts product.

12. Whether the two screw holes of the redesigned U-mounts product are formed in a line perpendicular to an axial direction defined by an axis of the U-mounts product.

13. Whether the screw holes of the original and redesigned U-mounts products (collectively, "U-mounts products") are cylindrical holes having parallel axes.

14. Whether Substantially an entire rear face of the U-mounts products is planar.

15. Whether a lower portion of a front face opposite the rear face of the U-mounts products is inclined obliquely with respect to the rear face of the U-mounts products.

16. Whether a lower portion of the front face of the U-mounts products is inclined away from the rear face of the U-mounts products in a direction extending from the lower end to an upper end of the U-mounts products.

17. A determination of the lower portion of the front face of the U-mounts products.

18. Whether the lower portion of the front face of the U-mounts products bears the word "SCREWS".

19. Whether the parallel axes of the holes of the original and redesigned U-mounts are inclined at an upward angle with respect to a cabinet wall when a first end of the U-mounts

products is pressed against an underside of a sink and a distal end of the U-mounts products is secured to the cabinet wall by a plurality of mounting screws inserted at the upward angle through a front side of a second end of the U-mounts products, the front side of the second end portion being obliquely inclined with respect to a substantially entirely planar rear face of the U-mounts products.

20. Whether Defendant sold the original U-mounts products together with two mounting screws for each U-mounts product unit sold.

21. Whether Plaintiff's counsel ordered a shipment of original U-mounts products prior to filing suit.

22. Whether Plaintiff's counsel received the shipment of original U-mounts products prior to filing suit.

23. Whether the shipment of original U-mounts products received by Plaintiff's counsel prior to filing the lawsuit included two mounting screws for each original U-mounts product unit in the shipment.

24. Whether the function of a "plurality of screw holes formed along the length of the second end of the support bar", as recited in '609 Patent claims 8 and 16, is to "allow for various angular orientations of the support bar [] during installation while simultaneously permitting an installer to drive the screws straight into the wall [] of the cabinet []". '609 Patent at 7:55–59.

25. Whether Defendant has never sold U-mounts products together with a sink or cabinet.

26. Whether Defendant has never sold U-mounts products already installed in a sink cabinet.

27. Whether Defendant has never sold U-mounts products having a second end of a support bar of the U-mounts products rigidly secured to the wall of a sink cabinet.

28. Whether a first end of a support bar of a U-mounts product being pressed against the underside of a sink does not inherently cause a second end of the support bar to be rigidly secured to the wall of a cabinet.

29. Whether Defendant has ever sold the U-mounts products wherein with a first end of a support bar of the U-mounts products pressed against the underside of a sink, a second end of a support bar of the U-mounts products is rigidly secured to a wall of a cabinet.

30. Whether neither the original nor the redesigned U-mounts products includes a plurality of screw holes formed in a line matching a length direction of a second end of the U-mounts products.

31. Whether neither the original nor the redesigned U-mounts products includes a plurality of screw holes formed in a line matching the direction of an axis of a central support body or an axis of a support bar of the U-mounts products.

32. Whether neither the original nor the redesigned U-mounts products includes a plurality of screw holes formed along the length of a second of the U-mounts products.

33. Whether the redesigned U-mounts products wholly lack screw holes formed at different positions with respect to a length direction of a second end of the redesigned U-mounts products.

34. Whether neither the original nor the redesigned U-mounts products comprises a second end of a support bar including a support beam extending therealong from a central support body to a distal end and a back surface cap member.

35. Whether a purported support beam of the U-mounts products does not extend along the length of the second end and instead terminates prior the position of a third hole of the original U-mounts products and a filled-in hole of the redesigned U-mounts products.

36. Alternatively, whether a purported support beam of the U-mounts products terminates where inner surfaces of a purported front surface cap member and a purported back surface cap member meet, at a location displaced at a distance from a distal end of the U-mounts products.

37. Whether the '461 application as filed does not contain the phrase "angularly oriented".

38. Whether the '461 application as filed does not use any inflectional form of the root word "angle" to refer to or describe an orientation of a second end of a support bar relative to a central support body.

39. Whether the '461 application as filed does not use any synonym of the word "angle" to refer to or describe an orientation of a second end of a support bar relative to a central support body.

40. Whether the '461 application as filed uses the terms "curved", "curvature," "radius of curvature", "concave", and "central axis" eight times to refer to the shape of "second end 146" or features thereof. *See* '609 Patent at 7:25, 7:30, 7:43, 7:47, 7:48, 7:49, 8:27, 8:30–31.

41. Whether the sole independent claim of the '461 application as filed that is directed to a one-piece mounting driver, namely, claim 17, recites, "the second end of the support bar is curved such that a back surface cap member of the support bar defines a concave surface along a back side of the support bar".

42. Whether the '609 Patent states, "While a series of spaced holes are disclosed in accordance with a preferred embodiment, it is appreciated a slot might also be employed to provide for versatility in the positioning of the support arm during installation". '609 Patent at 8:10–14.

43. Whether the '461 application as filed does not state a category of shapes that might be employed for second end 146 of support bar 116, of which "curved" is a member or example.

44. Whether the '461 application as filed does not state a specific alternative to a "curved" shape that might also be employed for second end 146 of support bar 116.

45. Whether the '461 application as filed does not state a genus or category of shapes that might be employed for "concave surface 167" (numeral "167" omitted from '609 Patent drawings) defined by back surface cap member 164 along the "back side 116b" (numeral "116b" omitted from '609 Patent drawings) of the support bar 116, of which "concave" is a species or member. *See, e.g.,* '609 Patent at 7:41–44.

46. Whether the '461 application as filed does not state a specific alternative to a "concave" shape that might also be employed for a surface 167 defined by back surface cap member 164 along a back side 116b of support bar 116.

47. Whether the '461 application as filed states, "the second end 146 of the support bar 116 . . . exhibits a curvature. . ."

48. Whether the '461 application as filed does not refer to a second end of a support bar being "angularly oriented" relative to a central support body.

49. Whether neither the original nor the redesigned U-mounts products comprise a second end of the support bar having a surface defined by a back surface cap member that is angularly oriented relative to the central support body.

50. Whether neither the original nor the redesigned U-mounts products comprise a back side of a support bar that is angularly oriented relative to a central support body at a lower end of the support bar in which screw holes are formed.

51. Whether Defendant sells redesigned U-mounts products.

52. Whether Defendant imports redesigned U-mounts products.

53. Whether Defendant manufactures redesigned U-mounts products.

54. Whether Defendant has given away for free 1,745 original design U-mounts products.

55. Whether Defendant's gross revenues from sales of the accused U-mounts product are $39,045.63.

## IV. ISSUES OF LAW ON WHICH THE PARTIES DO NOT AGREE AND ARE TO BE DETERMINED BY THE COURT

A specification of a patent as filed must "contain a written description of the invention." 35 U.S.C. § 112(a). A specification has an adequate written description only when it "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date" of the patent. *Rivera v. ITC*, 2017 U.S. App. LEXIS 8931, *8, No. 2016-1841 (Fed. Cir. May 23, 2017), *citing Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Adequacy of written description is a question of fact. *Id.* "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art . . . . [to] show that the inventor actually invented the invention claimed." *Id.*, *quoting Ariad*, 598 F.3d at 1351. A generic claim that extends beyond what the specification "reasonably conveys to those skilled in the art that the inventor had possession of", results in a claim that is invalid for inadequate written description. *See LizardTech, Inc. v. EarthRes. Mapping, Inc.*, 424 F.3d 1336, 1345–47 (Fed. Cir. 2005) (affirming a the district court's holding that, where

a patent specification provided "only one method for creating a seamless DWT [discrete wavelet transform], which is to 'maintain updated sums' of DWT coefficients", a claim that "refers to taking a seamless DWT generically" without a "maintain updated sums" limitation was invalid for inadequate written description).

V.  **MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT**

1. Defendant's Motion in Limine to Exclude Reference to the '898 patent, which is not in suit. [DE 105]

2. Defendant's motion to adopt the Courts rationale on indefiniteness as the jury instruction for the meaning of the disputed claim 16 term "angularly oriented", which was not addressed in the claim construction portion of the Court's Order. [DE 103].

Respectfully submitted.

**FISHER BROYLES, LLP**

*/s/ Charles G. Geitner*
Charles G. Geitner, Esq.
Florida Bar No.: 85170
100 S. Ashley Dr., Suite 600
Tampa, FL 33602
(813) 724-3140
(813) 724-3179 (facsimile)
Charles.Geitner@FisherBroyles.com

and

Jeffrey S. Dixon, *pro hac vice*
Illinois Bar No. 6291231
**Cygan Law Offices, P.C.**
1600 Golf Road, Suite 1200
Rolling Meadows IL, 60008
847-956-4915
Fax: 888-416-8495
*Attorneys for Defendant,*
*Z Keepers, LLC*

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on September 17, 2018 a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                */s/ Charles G. Geitner*
                Charles G. Geitner, Esq.