## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CINCLIPS, LLC,
  a Georgia Limited Liability Company

      Plaintiff,

                                      Civil Action No. 8:16-cv-01067-JSS

v.

Z KEEPERS, LLC,
  a Florida Limited Liability Company,

      Defendant.

_____/

### Z KEEPER'S MOTION FOR AN WARD OF ATTORNEYS' FEES AND COSTS

      Defendant, Z Keepers, LLC, respectfully requests that the Court award Defendant, as the prevailing party, its costs and reasonable attorneys' fees following the Judgement [DE 152] entered in favor of Defendant on September 28, 2018 and the Jury Verdict [DE 147], pursuant to 35 U.S.C. § 285 of the Patent Act, Rule 54(d) of the Federal Rules of Civil Procedure, and Middle District Local Rule 4.18.

## I.    UNDER RULE 54(d), THE DISTRICT COURT HAS DISCRETION TO AWARD COSTS TO Z KEEPERS AS THE PREVAILING PARTY.

      Z Keepers requests an award of its costs as the prevailing party. "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. Pro 54(d). "Federal Circuit law defines 'prevailing party' for the purposes of patent litigation." *Shum v. Intel Corp.*, 629 F.3d 1360, 1366 (Fed. Cir. 2010). "[T]here can only be one prevailing party in a given case." *Id*. at 1367. To be a "prevailing party," Federal Circuit precedent requires that the party have received at least some relief on the

merits which "materially alters the legal relationship between the parties by modifying one party's behavior in a way that 'directly benefits' the opposing party." *Id*.

CinClips will no doubt argue that although the jury returned a verdict in favor Z Keepers of noninfringement on all claims at issue under the '609 patent, that CinClips should nonetheless be considered the prevailing party because the jury did not find sufficient clear and convincing evidence to render judgment in Z Keeper's favor on the affirmative defenses that Z Keeper's asserted. However, the Federal Circuit has determined that "***[a] party is not required* . . . *to prevail on all claims*** in order to qualify as a prevailing party under Rule 54." *Shum*, 629 F.3d at 1367-68 (emphasis added) (concluding "[w]e agree with the district court that the relief defendants obtained on these claims alters the legal relationship of the parties: in addition to avoiding significant monetary liability, the judgment in defendants' favor will have res judicata effect in any future action"). *See also Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) ("Brooks raised several defenses to the charge of patent infringement, any of which would have achieved Brooks' goal. Thus when Brooks established its non-infringement of the Dutailier patent, it prevailed in the litigation. That other defenses, such as invalidity of the patent, were unsuccessful or withdrawn, does not change the outcome in Brooks' favor.")

Here, as in *Shum v. Intel Corp.*, Z Keepers obtained relief on the merits which altered the legal relationship of the parties because Z Keepers avoided significant monetary liability, and the jury verdict of noninfringement in Z Keeper's favor will have res judicata effect in any future action. Accordingly, Z Keepers is the prevailing party. In contrast, the fact that the jury did not find sufficient clear and convincing evidence to support the affirmative defenses were also pled has no impact on the legal relationship that existed between Z Keepers and CinClips prior to this lawsuit. Accordingly, CinClips is not the prevailing party. Because Z Keepers is the prevailing

party under Federal Circuit precedent, "costs should be allowed" to Z Keepers as the prevailing party. See Rule 54(d).

## II.   UNDER THE SUPREME COURT'S DECISION IN *OCTANE FITNESS*, THE DISTRICT COURT HAS DISCRETION TO AWARD ATTORNEYS' FEES TO DEFENDANT WHEN THE TOTALITY OF THE CIRCUMSTANCES PRESENT AN EXCEPTIONAL CASE.

Under the Patent Act, a district court has discretion to award attorneys' fees to the prevailing party in "exceptional" cases brought under the Patent Act. *See* 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party").

The Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S. Ct. 1749 (2014) addressed the standard for determining whether a case is considered "exceptional" under the Patent Act's fee provision.  The Supreme rejected the Federal Circuit's *Brooks Furniture* standard for awarding fees, which limited the types of cases considered "exceptional" by only permitting an award of fees to litigants who demonstrated by clear and convincing evidence that the case involved sanctionable misconduct, or that involved litigation brought in subjective bad faith, that was objectively baseless or frivolous. *Id*. at 1754.

The *Octane* Court found that "[t]he framework established by the Federal Circuit in *Brooks Furniture* is unduly rigid, and it impermissibly encumbers the statutory grant of discretion to district courts."  *Octane Fitness*, 134 S. Ct. at 1755. The *Octane* Court announced instead that "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 1749.

The *Octane* Court then noted that term "exceptional" should be given its ordinary meaning and determined that "exceptional" meant only that it was "uncommon," "rare," or "not ordinary". *Id*. (citing Webster's New International Dictionary 889 (2d ed. 1934)). The *Octane* Court then announced that "an 'exceptional' case is simply one that **stands out from others** with respect to

3

the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* at 1756 (emphasis added). The *Octane* Court further explained that "'[t]here is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'" *Id.* (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994)).

The *Octane* Court rejected the Fed Circuit's *Brooks Furniture* standard for another reason, because it was "so demanding that it would appear to render § 285 largely superfluous." *Id.* at 1758. In other words, the *Octane* Court found that the overly restrictive standard in *Books Furniture* merely equated to the "'inherent . . . power [of] the courts' that allows a court to sanction a party's 'willful disobedience of a court order' or 'when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . .'". Octane Fitness at 1758 (quoting *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U.S. 240, 258-259, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975)).

Finally, the *Octane* Court rejected "the Federal Circuit's requirement that patent litigants establish their entitlement to fees under § 285 by 'clear and convincing evidence,'" finding that "nothing in § 285 justifies such a high standard of proof." The *Octane* Court clarified that:

> "Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard . . . and that is the 'standard generally applicable in civil actions,' because it 'allows both parties to 'share the risk of error in roughly equal fashion.'"

*Octane Fitness* at 1758 (quoting *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 390, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983)).

Looking to *Octane Fitness* for guidance, the Federal Circuit has noted that "the Supreme Court adopted a holistic and equitable approach", and that "whether a party's merits position was objectively reasonable is not dispositive under § 285". *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017). "The district court may now consider **the totality of the circumstances** to determine whether this case is 'exceptional,' and the district court is not necessarily required to find evidence of the specific factors outlined in *Brooks Furniture*." *Adjustacam, LLC v. Newegg, Inc.*, 626 F. App'x 987, 990-91 (Fed. Cir. 2015) (emphasis added).

## III.   THE TOTALITY OF THE CIRCUMSTANCES WEIGH IN FAVOR OF AWARDING Z KEEPERS ITS REASONABLE FEES.

The instant case is one that should never have been brought against Z Keepers.  It stands out from other patent infringement cases because was brought in bad faith, so that Dow Blaine ("Blaine") could exact revenge against Dimitri Kelner (Kelner), who was an acquaintance of Z Keeper's principal, David Smith ("Smith").

### A.   Evidence of Blaine's bad faith motivation for filing the lawsuit and his false testimony regarding sales of knockoff GoClips products to obtain revenge.

The testimony at trial showed that CinClips' lawsuit was motivated by the animosity that its owner, Blaine, felt for Kelner. Specifically, Blaine testified he trusted Kelner and had shown Kelner an early version of CinClips two-piece product while at Kelner's shop, but that he had a falling out with Kelner regarding work Kelner had performed on a job they worked together, and Blaine incorrectly assumed Kelner was a part owner of Z Keepers. Trans. pp. 28-29, 59-60, 168 lines 17-24, p. 169 lines 1-6, pp. 201, 306-308. Blaine stated to Z Keepers' distributors that he was going to sue Z Keepers "into oblivion". Trans. p. 386, line 14-19.

In addition to filing this lawsuit against Z Keepers, Blaine has endeavored to exact his revenge against Kelner by purchasing a quarter million knockoff "GoClips" devices, and then selling them to distributors. Specifically, Blaine testified that "he was mad" so he "went to China and I ordered product that was just like his and I went out to sell them half price . . ." Trans. pp. 87, 91-92, 106 line 18- p. 109, 112 line 22-116 line 12, pp., 436-438, 442-444. He said he "might have but didn't remember" whether he had texted distributors a picture of a knockoff of the GoClips product, even when presented with one of his text messages.

 

See Trl Ex. 38 [DE 148-23], at pg. 9 (contrasting authentic GoClips with knockoff "ProClips" products) and pg. 10 (Blaine's text message distributors with the knockoff product image and pricing); see also Trl. Trans. p. 107, lines 9-23.

Although Blaine testified that he only acquired "maybe 10,000" knockoff GoClips to sell, even the invoices he introduced into evidence demonstrate he sold cases of knockoff "proclips" containing thousands more. See example knockoff "ProClips" sales included within Pltf. Trl Ex. 43 [DE 148-26] at pgs. 33-37, 43-44, 46, 52-56, 65, 71-72, 79, 82, 94-95, 107, 109, 137).

In an effort to convince the jury that he did the right thing after receiving Smith's letter on December 1, 2017, Blaine falsely testified that he stopped selling the knockoff "ProClips".  See Trl. Trans at 92, lines 2-5 (Blaine testifying "he got a patent for his GoClips and he put me on notice, and so I stopped selling them."); Trl Trans. at p. 439, line 20 to p. 441, line 22, (foundation for Smith's 12-1-2017 letter Blaine notifying him of GoClips patent; See also Trl. Ex. 38 [DE 148-23] (Smith's 12-1-2017 letter to Blaine). However, the invoices Blaine submitted into evidence demonstrate that Blaine in fact kept selling the knockoffs from January through March of 2018, and at least at late as May 29, 2018.



In his invoices, Blaine even provided his customers with his cell number and his email address (dow@cinclips.com) to order additional knockoff "ProClips" products.

Blaine even went so far as to provide samples of the knockoffs along with his CinClips device to a distributor of Z Keeper's after traveling to Chattanooga to attend Smith's deposition:



See Def. Trial Ex. 124 [DE 149-12]. Blaine's actions in filing suit to get revenge against Kelner, and selling knockoff proclips products during discovery in this case to further his revenge, and his false statements to the jury claiming that he voluntarily stopped selling the knockoffs when he received Smith's letter, when in fact his own invoices demonstrate Blaine continued to sell the knockoffs as late as May 28, 2018, are among the circumstances that, taken together, show this case to be out of the ordinary and deserving of an award of fees under section 285.

**B.  Evidence of bad faith during patent prosecution.**

Blaine's effort to exact revenge spilled into the patent prosecution and his testimony in this case regarding alleged infringement.

Blaine testified that he first learned about Z Keepers' U-Mounts device when he was at a customer's shop, and someone came in selling these (holding up a U-Mounts device). Trl Trans. p. 59 lines 3-10 (Blaine testifying "when I was selling CinClips . . . someone came in selling these", I was "floored . . . somebody was making something almost identical"). Blaine then testified that when he found out about the device, he sent a text to Smith. Trl. Trans at p. 73 line 8 to p. 74 line 19 (Blaine testifying he texted Smith because he was annoyed and real upset).



Blaine also testified that after he received Smith's reply text, he called opposing counsel immediately. Trl. Trans p. 75 line 20 to p. 76 line 1.

Before the text was produced in discovery, Blaine had misrepresented in his interrogatories that he "first became aware of the U-Mounts in September 2015". See Trl. Trans at p. 103 lines 7-24. Incredibly, Blaine testified he misunderstood the interrogatory asking "when he first became aware" to mean "when he first saw" the Umounts device, and even less credibly, Blaine testified he sent his text message threatening Smith that he would hear from Blaine's attorneys, based upon a mere verbal description from someone he could not identify. Trl. Trans p. 103 line 25 to p. 105 line 14 (Blaine testifying as to the January 2015 text "That's when somebody said something to me but I didn't know for sure what"). It is more likely than not that this bad faith misrepresentation confused and misled the jury in its determination as to the adequacy of written description support in the original specification for the asserted claims, both directed to a device lacking a curved second end, and more particularly, support for '609 patent claim 16, which substitutes for the omitted "curved" limitation a requirement of a second end that is "angularly oriented relative to

the central support body".  Had Cinclips' representative Dow Blaine not obscured from the jury evidence that the language of '609 patent claim 16 was written specifically to read on the structure of the U-Mounts device, it is more likely than not that the jury would have carefully studied the language of the '609 patent specification to determine whether there was sufficient description *inside* the original specification for a claim whose motivation clearly came from *outside* the original specification, and would have answered the verdict form differently.

Notwithstanding Blaine's text threat to Smith in January 2015 that he would be "enforcing his patent rights", Blaine in fact had no patent rights to enforce, because the '609 patent was at that time an unpublished patent application. Pltf. Trl. Ex. 1 [DE 148-1] at p. 3 (reflecting the application publication date of April 23, 2015, and patent issuance date of September 15, 2015). Long before Blaine's patent application became published in April 2015, Smith had already created a prototype, had the mold created, and had purchased 55,000 U-Mounts devices and had begun selling them. So that no one could have reviewed Blaine's patent claims in advance of the production of the U-Mounts device. Indeed, in January 2015, when Blaine sent his text threat to Smith, Blaine's patent application had only one independent claim (claim no. 17) describing a single driver as follows:

> 17.   A mounting driver for undermounting a sink to a support surface, comprising:
>
> a support bar shaped and dimensioned for positioning between an underside of the sink and a wall of a cabinet at an angular orientation relative to the wall, the support bar including a first end and a second end;
>
> the second end of the support bar is curved such that a back surface cap member of the support bar defines a concave surface along a back side of the support bar, and extending through the back surface cap member are a plurality of holes formed along the length of the second end of the support bar;
>
> wherein with the first end of the support bar pressed against the underside of the sink, the second end of the support bar is rigidly secured to the wall of the cabinet.

27

CINCLIPS-000118

See Def. Trl. Ex. 2C [DE 149-4] at p. 3.

Claim 17 of Baine's patent application contained language that was faithfully consistent with the specification that Blaine authored for the single piece undermount when he filed his patent application. Specifically, Blaine's specification for the single piece undermount, which is reflected in Columns 6, 7 and 8 of the '609 patent, states as follows:

> due to the failure of the previously used mounting structure.
> It is also contemplated the mounting driver **110** may be constructed in a one-piece manner as shown with reference to
> 40 FIGS. **16** to **18.** In accordance with such an embodiment, the mounting driver **110** includes a support bar **116** shaped and dimensioned for positioning between an underside **118** of the sink **112**, wherein the support bar includes an arcuate mounting surface **117** adapted for direct attachment to the wall **120**
> 45 of a cabinet **122** at an angular orientation relative to the wall **120**.

See specification for single piece support located in Plt. Trl. Ex. 1 [DE 148-1] at column 6, p. 23.

> respect to the plane.
> As to the second end **146** of the support bar **116**, it is consistent in width with the central support body **150** of the support bar **116**, but exhibits a curvature as it extends from the 25 central support body **150** to the distal end **149** of the support bar **116** at the second end **146** thereof. In particular, the back side defined by the back surface cap member **164** is flat from the first end **144** of the support bar **116** to the central support body **150** of the support bar **116**, but exhibits a curved surface 30 at the second end **146** of the support bar **116**. As to the front side defined by the front surface cap member **162**, as well as

> More particularly, the second end **146** of the support bar **116** is curved such that the back surface cap member **164** defines a concave surface **167** along the back side **116**b of the support bar **116**. This back surface cap member **164** is ultimately shaped and dimensioned for positioning along the 45 wall **120** of the cabinet **122** during the installation process.
> In particular, the concave surface **167** has a radius of curvature. The concave surface **167** extends about a central point through which a second end central axis **171** normal to the plane symmetrically bisecting the second end **146** extends. 50
> Extending through the back surface cap member **164** are two sets of holes **196**, **198** formed along the length of the second end **146** of the support bar **116** allowing the second end **146** of the support bar **116** to function as a mounting bracket. These holes **196**, **198** allow for various angular ori- 55 entations of the support bar **116** during installation while simultaneously permitting an installer to drive the screws **200** straight into the wall **120** of the cabinet **122** (or other support structure).

See specification for single piece support located in Plt. Trl. Ex. 1 at column 7, p. 24.

Two months after sending his January 2015 text threat to Smith, Blaine's patent claims were rejected. Def. Trl. Ex. 2B [DE 149-3]. So, Blaine took the opportunity to cancel the claims in his application describing the two-piece sink support he was manufacturing and selling described in claims 1-16, he then reasserted a modified version of claim 17 above that stated:

Application No. 14/095,461
Amendment dated May 14, 2015
Reply to Office Action of March 27, 2015

**AMENDMENTS TO THE CLAIMS:**

1-16.   (Canceled)

17.   (Currently amended) A one-piece mounting driver for undermounting a sink to a support surface, comprising:

a support bar shaped and dimensioned for positioning between an underside of the sink and a wall of a cabinet at an angular orientation relative to the wall, the support bar including a first end having a sink engaging member with a curved surface shaped and dimensioned to engage the underside of the sink and a second end with a central support body therebetween;

the second end of the support bar includes a support beam extending therealong from the central support body to a distal end and a back surface cap member, the support beam lying in a plane that is perpendicular to a back side of the support bar surface as defined by the back surface cap member, wherein the back surface cap member is curved such that [[a]] the back surface cap member of the support bar defines a concave surface along [[a]] the back side of the support bar, and extending through the back surface cap member are a plurality of screw holes formed along the length of the second end of the support bar for the passage of a mounting screw;

wherein with the first end of the support bar pressed against the underside of the sink, the second end of the support bar is rigidly secured to the wall of the cabinet.

See Def. Trl. Ex. 2E [DE 149-6] at pg. 2. Because claim 17, as amended, continued to describe a "curved" and "concave surface" for the second end's back surface cap, this claim in the application was not a suitable basis for Blaine to make good on his threat to have attorneys enforce his patent

rights in an infringement lawsuit. So, in bad faith, Blaine added independent claims 25 and 33 to his application, crafting language that assiduously avoided the using the terms "curved" and "concave", stating:

25.   (New) A one-piece mounting driver for undermounting a sink to a support surface, comprising:

a support bar shaped and dimensioned for positioning between an underside of the sink and a wall of a cabinet at an angular orientation relative to the wall, the support bar including a first end having a sink engaging member with a curved surface shaped and dimensioned to engage the underside of the sink and a second end with a central support body therebetween;

the second end of the support bar includes a support beam extending therealong from the central support body to a distal end and a back surface cap member, the support beam lying in a plane that is perpendicular to a back side of the support bar surface as defined by the back surface cap member, and extending through the back surface cap member are a plurality of screw holes formed along the length of the second end of the support bar for the passage of a mounting screw;

wherein with the first end of the support bar pressed against the underside of the sink, the second end of the support bar is rigidly secured to the wall of the cabinet.

See Def. Trl Ex. 2E at p. 5.

33.   (New) A one-piece mounting driver for undermounting a sink to a support surface, comprising:

a support bar shaped and dimensioned for positioning between an underside of the sink and a wall of a cabinet at an angular orientation relative to the wall, the support bar including a first end having a sink engaging member with a surface shaped and dimensioned to engage the underside of the sink and a second end with a central support body therebetween;

the central support body being of an I-beam construction which, when viewed along a cross sectional plane taken perpendicular to a longitudinal axis extending from the first end of the support bar to the second end of the support bar, has a rectangular member and first and second cap members positioned at first and second ends of the rectangular member;

the second end of the support bar is angularly oriented relative to the central support body,

6

13

Application No. 14/095,461
Amendment dated May 14, 2015
Reply to Office Action of March 27, 2015

and extending through the second end of the support bar are a plurality of screw holes formed along

the length of the second end of the support bar for the passage of a mounting screw;

wherein with the first end of the support bar pressed against the underside of the sink, the

second end of the support bar is rigidly secured to the wall of the cabinet.

See Def. Trl Ex. 2E [DE 149-6] at pp. 6-7. These new claims numbered 25 and 33 in the patent application were eventually renumbered as independent claims 8 and 16 of the '609 patent when it issued. See Def. Trl. Ex. 2A [DE 149-2].

Unlike (and wholly lacking 35 U.S.C. § 112(a) support in)[1] the specification's description of the invention in columns 6, 7 and 8, and unlike application claim 17 (renumbered in '609 patent as Claim 1), which are replete with references to the terms "curved back surface cap", "concave surface", and "arcuate surface", by adding new claim 25 ('609 claim 8) and new claim 33 ('609 claim 16) to his application in May 2015, Blaine armed himself with claims that would allow him to sue Z Keeper's for infringement, which previously would not have been possible.

Under analogous circumstances, the Federal Circuit found, pre-*Octane*, that an effort by the patentee to assiduously avoid the specification's multiple references to the "application of heat" when construing the claim term "bonded", gave rise to "bad faith in filing a baseless infringement action" sufficient to award attorneys' fees under section 285 of the patent Act.  See *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 918 (Fed. Cir. 2012).  The *MarcTec* court noted that "the district court rejected MarcTec's attempts to minimize the role of the specification, noting that, in *Phillips*, we indicated that the specification 'is the single best guide to the meaning of a disputed

---

[1] As noted above, although the jury answered in the negative that Z Keepers had proven a lack of written description support for the claims of the '609 patent under 35 U.S.C. § 112(a), it is more likely than not that the jury was misled by Cinclips' misrepresentations that Dow Blaine was not aware of the structure of the U-Mounts device when '609 patent claim 16 was submitted to the patent office in May 2015.

term.'" *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 912 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-19 (Fed. Cir. 2005) (*en banc*)).  The *MarcTec* court concluded "after careful consideration and review of the record, we agree with the district court that MarcTec's proposed claim construction, which ignored the entirety of the specification and the prosecution history, and thus was unsupported by the intrinsic record, was frivolous and supports a finding of bad faith." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 918 (Fed. Cir. 2012); *see also Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 687 F.3d 1300, 1311 (Fed. Cir. 2012) (pre-*Octane* decision finding an exceptional case of noninfringement because "it [was] clear from the specification that an 'integrated health care management system' required patient and employer interaction in addition to the participation of the health care provider and insurer", which did not exist in Johnson & Johnson's system).

Z Keepers requests that Plaintiff's bad faith manipulation of the claim language following almost a calendar year of Z Keepers' sale of its Umounts device, in order to avoid the specification's terms "curved, concave, and arcuate" when describing the shape of the second end's back surface cap, should be considered among the totality of the circumstances supporting the award of fees to Z Keepers under section 285 of the Patent Act.

**C.  Plaintiff's bad faith infringement presentation at trial.**

Plaintiff presented its infringement case in bad faith, avoiding express claim language when presenting witnesses in an effort to establish infringement and confuse the jury.

First, Plaintiff, through Blaine's testimony attempted to cast the invention's claim language as requiring merely that the undermount support have a rounded first end, a strong support member, and a mechanical attachment to the wall of the cabinet. Specifically, Blaine testified:

```
5   Q      So what were the main components you were thinking of
6   for your invention?
7   A      The components are a rounded distal end that will mount
8   up to the lip of the sink with a central support body that
9   will not have a moment.  And a moment is movement or a
10  failure.  When you have movement in a product, it's failure.
11  So they call that a moment.

12         So I wanted a product that would not have a moment, a
13  strong body set up there and a mechanical attachment to hold
14  it to the wall.  And it could be a straight, it could be
15  curved.  It could be two pieces, one piece, doesn't matter.
16  There's several different configurations.
17  Q    Now, if you turn the page, what are we looking at with
18  Figures 5, 6 and 7?
```

Trl. Trans. at p. 17. Plaintiff's efforts to mislead the jury on the scope of his invention continued during his discussion of the patent figures:

```
15  Q     Yeah.  So just looking at Figure 16, can you describe
16  the features of your invention that you see there on Figure
17  16?
18  A      Sure.  It has a round distal end to go up to the sink.
19  It has a central support body, and it has a mechanical
20  apparatus to screw it to the wall.
```

                                    . . .

```
2   Q    You understand the point of your invention was the
3   mechanical means by which the bracket actually gets
4   installed into the cabinets?
5   A    Yes, sir.
6   Q    Okay.  And walk me through that, please.
7   A    I'm sorry?
8   Q    Walk me through that.  What about screwing it to the
9   cabinet wall was important?
10  A      Because it puts all the weight of the sink onto the
11  side of the cabinet so the cabinet supports that weight, not
12  the granite or the marble.
```

16

Trl Trans. at pp. 18-19. Blaine's mischaracterization of his invention continued:

```
25   Q    Can you show the jury the features that you were

 1   mentioning before that give that strength?
 2   A    Sure.  It has a rounded end to meet up to the sink.  It
 3   has a structural support body, and it has a mechanical end
 4   to mount it to the cabinet with, to put the weight to the
 5   cabinet.
```

Trl. Trans at p. 24 line 25 to p. 25. Blaine's misleading presentation of the claim elements extended to his description of the U-Mounts device:

```
 4   Q    Have you had a chance to compare that product, the
 5   U-mount, to the claims of your patent, the six --
 6   A    I have.
 7   Q    You have?
 8   A    I have.
 9   Q    And what was your read?
10   A    Well, it has a nice rounded end to mount it up there.
11   It's a support structure, rigid support structure, and a
12   mechanical end to mount it to the wall.
```

Trl. Trans. at p. 61. It was only on cross, that Blaine acknowledged that the feature that made his invention unique, the mechanical attachment that shifts the force of the sink into the cabinet wall, likewise exists in a furring strip, which has been used for decades. See Trl. Trans. at p. 126 line 10 to p. 127 line 11.

Blaine continued to mischaracterize the claims of his patent during his testimony regarding the specific claim language of claims 8 and 16. On two separate occasions, Cinclips' counsel carefully avoided asking Blaine about the arrangement of the "plurality of screw holes", so that Blaine could avoid testifying that the U-Mounts lacked a plurality of screw holes "formed along

the length of the second end."  Specifically, at page 63 of the Trial Transcript, Blaine was presented

with the following text from claim 8 of the '609 patent:

> of the support bar surface as defined by the back surface
> cap member, and extending through the back surface cap
> member are a plurality of screw holes formed along the
> length of the second end of the support bar for the pas-
> sage of a mounting screw;                                     55
> wherein with the first end of the support bar pressed against

Opposing counsel then asked the following questions of Blaine about Claim 8:

```
19   Q    -- can you point to a plurality of screw holes formed
20   along the -- I'm sorry?
21   A    Yes, sir.  Here.
22   Q    You're pointing at the three screw holes?
23   A    Yes, sir.
24   Q    And are those screw holes for the passage of a mounting
25   screw?
```

Trl. Trans. at p. 63. Then opposing counsel presented Blaine with the nearly identical claim

language contained in independent Claim 16 of the '609 patent:

> the second end of the support bar is angularly oriented
> relative to the central support body, and extending
> through the second end of the support bar are a plurality
> of screw holes formed along the length of the second end
> of the support bar for the passage of a mounting screw;
> wherein with the first end of the support bar pressed against
> 45

Opposing counsel once again specifically avoided asking Blaine about the location of the plurality

of screw holes in Claim 16, so that Blaine would not have to admit that the Umounts lacked the

element requiring that they be "formed along the length of the second end":

```
12  Q    And extending through that second end, is there a
13  plurality of screw holes?
14  A    Yes, sir, there are.
15  Q    For the passage of a mounting screw?
16  A    Yes, sir, there is.
17  Q    And then the last paragraph, go ahead.
```

Trl. Trans at p. 70. There efforts were no accident. Opposing counsel made a third effort to avoid referencing the requisite location of the screw holes along the length of the second end when questioning Mr. Smith, as follows:

```
4   Q    So the support beam, we talked about it.  So you said
5   you can't see that.  So we'll just leave that highlighted.
6        Now, extending through the back surface cap member, are
7   there a plurality of screw holes?
8   A    Of the second end or the central support body?
9   Q    Just reading right here.  "Extending through the back
10  surface cap member are a plurality of screw holes."
11  A    Of the second end or of the central support body?
12  Q    I'm just reading this language right here.  Yes, you
13  can see this or, no, you can't see it?  Extending -- just
14  looking at this language of this claim --
15  A    I guess, you know, my point is -- after -- after
16  reinterpreting the specification based on Mr. Blaine's
17  testimony, it's -- I can't -- we don't look at it the same
18  as you're looking at it.  So we're --
19  Q    I'm not asking for --
20  A    -- we are talking about plain language.
21  Q    Plain language here.
```

Trl. Trans. at p. 488. As a result, Z Keepers requests that the Court consider Plaintiff's bad faith presentation of infringement, including Blaine's misrepresentations regarding the scope of the invention, and the absent claim element location of the plurality of the screw holes in Claims 8 and 16, in the totality of circumstances supporting an award of fees under section 285.

   **D.  Other evidence of Plaintiff's bad faith.**

In addition to the foregoing bad faith conduct, Plaintiff engaged in other bad faith conduct.

For example, Blaine contacted Devon Bogue, a testifying witness, during trial to explain to Mr. Bogue that he was doing very well in the case. Trl. Trans at p. 466. In addition, Blaine has threatened to take every single dollar Z Keepers earned, as well as other sink support manufacturers who produce non-infringing substitutes with the same overly broad interpretation of the '609 patent that he presented at trial. See Trl. Trans. at p. 375 line 17 to p. 376 at p. 14; p. 467, line 17 to p. 468 line 1.

During the cross examination of Smith, Plaintiff attempted to imply that Smith somehow violated the Patent Act by failing to disclose wedge cut furring strips as prior art when filing his provisional patent application, when the Patent Act only requires such disclosures for a formal patent application submission. See Trl. Trans at p. 455 to 456. Then during a sidebar, counsel misrepresented to the Court that the duty of candor and oath or declaration applied to Smith's provisional application thus requiring a prior art disclosure. Trl. Trans. at p. 457.  However, the section governing provisional patent applications, 35 U.S.C. § 111(b)(1), makes clear that all that is required is a specification and a drawing.

In addition, Blaine was asked about the diagrams to the single piece driver (figs 16, 17 and 18) both as to the curved back surface of the support bar at the second end and with regard to the reference point 165, because the '609 patent figures were missing reference point 165 described in the specification for the transition between the central support bar to the second end.

at the second end 146 of the support bar 116. As to the front side defined by the front surface cap member 162, as well as the central trussed supporting structure 163 between the back surface cap member 164 and the front surface cap member 162, they end at the point 165 where the central support body 150 turns into the second end 146 of the support bar 116. The removal of this structure at this point allows for access to the back surface cap member 164, from the front side of the mounting driver 110, as will be appreciated based upon the following disclosure.

20

See Trl. Trans at. p. 268-269. The specification reference point determines the parameters of the support beam later referenced in claim 8 as follows:

> the second end of the support bar includes a support beam extending therealong from the central support body to a distal end and a back surface cap member, the support beam lying in a plane that is perpendicular to a back side 50 of the support bar surface as defined by the back surface cap member, and extending through the back surface cap member are a plurality of screw holes formed along the length of the second end of the support bar for the passage of a mounting screw; 55

When asked by Z Keepers counsel, Blaine accurately described the support beam as follows:

```
17  Q    "The second end of the support bar includes a support
18  beam extending therealong from the central support body to
19  the distal end."  What's the distal end?
20  A    Well, if it's not the top, it would be the bottom then.
21  Q    Okay.  It's the bottom part.  If you look at
22  Fig. No. 16, it's the tip, the bottom tip.
23  A    Okay.
24  Q    And the support bar that it's referring to, what's the
25  support bar in your Fig. 16 that extends all the way to the
```

```
1   distal end?
2   A    What is it?  Just a piece of plastic, I guess; a solid
3   piece, yeah.
4   Q    It's that little web that goes between the screw holes,
5   right?
6   A    Okay.  Yes, sir.
7   Q    Okay.  That's the support beam, that's what --
8   A    That's support for the tail.  Yes, sir.
```

Trl.Trans p. 145-146. Blaine then pointed to the web section between the screw holes in figure 16:



FIG. 16

When asked whether the support beam extends to the distal end of the Umounts, Blaine acknowledged that it did not, and that the Umounts therefore did not new claim claim 17 of the patent application.

```
 9   Q    Okay.  So you're saying it stops somewhere around where
10   the smiley face --
11   A    Something like that.  Yes, sir.
12   Q    It doesn't go all the way to the distal end, it stops
13   right here?
14   A    Yeah.  A little bit further in.  But you're right,
15   uh-huh.
16   Q    So the support beam stops before the distal end.  So,
17   therefore, this wouldn't infringe the new Claim 17 that
18   requires a support beam that goes to the distal end?
19   A    I guess not.
```

                                    . . .

```
12   Q    Okay.  And that element is missing from the U-mounts
13   device.  We don't have a support bar that runs to the distal
14   end?  You said it stops short at the screw hole?
15   A    Yes.  It blends right into the end.  It might go all
16   the way, but ...
17   Q    You didn't see it go all the way, right?
18   A    Well, you can't, because it blends in.  He molded it
19   together.
```

Trl. Trans. at pgs. 147, 165. However, when the same claim language was shown Blaine in claim 8 of the '609 patent, Blain altered his testimony to confuse the jury regarding identical claim language that formed the basis of his infringement claim as to claim 8.  Specifically, Blaine testified:

```
 9   Q    That's the one we said used to be called Claim No. 25
10   when you amended the application?
11   A    Okay.
12   Q    All right.  And so I'm going to the second paragraph of
13   Claim 8.  It says:  "The second end of the support bar
14   includes a support beam extending therealong from the
15   central support body to a distal end."  That's the same
16   claim language in 17 --
17   A    Okay.
18   Q    -- that you said didn't exist as far as Claim 17 is
19   concerned.  You remember that?
20   A    I suppose.  Not really.
21   Q    All right.  So if it doesn't exist for Claim 17, it
22   also doesn't exist for Claim 8, correct?
23   A    Not necessarily.
24   Q    Okay.  You want to change your opinion on what "the
25   second end of the support bar includes a support beam
```

Eventually, Blaine changed his testimony again, conceding that the failure of the support beam to extend to the distal end element meant that the Umounts did not infringe claim 8, or its dependent claims.  See Trl. Trans. at p. 170-175. It is because of the absence of a support beam extending to the distal end, and the absence of a plurality of screw holes formed along the length of the second end as described in the '609 patent claims 8 and 16, that Smith testified that the Umounts device was missing the second end described in claims 8 and 16. See Trl. Trans. at p. 399, lines 20-25.

These additional instances of bad faith and misconduct by Plaintiff at trial should be considered among the totality of the circumstances in awarding Z Keepers its fees under section 285 of the Patent Act.

## IV.   FEES AND COSTS INCURRED BY Z KEEPERS.

### A.   <u>Evaluating the reasonableness of costs and fees</u>.

The taxing of costs is to be made in accord with statute 28 U.S.C. § 1920. "In dealing with items of cost incurred and a determination of which items should be allowed, the issue is one of

23

discretion [and] the burden is upon the losing party to show the impropriety of an allowance." Bolt v. Halifax Hosp. Med. Ctr., No. 82-122-Orl-CIV-18, 1984 U.S. Dist. LEXIS 24414, at *4 (M.D. Fla. Aug. 11, 1984). "The provisions of 28 U.S.C. § 1920(2) makes taxable the fees of the court reporter for all or any part of the stenographer's transcript necessarily obtained for use in the case." Id. at *8.  28 U.S.C. § 1920 provides the authority for awarding the fees and costs for witnesses. Pursuant to 28 U.S.C. § 1821, taxable witness costs include "mileage or common carrier travel … an additional allowance for subsistence", which has been interpreted to allow costs for reasonable hotel stays. See Id. at *13. Section 1821(c)(4) provides: "All normal travel expenses within and outside the judicial district shall be taxable as costs pursuant to section 1920 of this title.'" Id. at *12. "Since the language of the statute deals with travel within and outside the judicial district, it indicates Congress intended to have the costs of travel actually incurred to be taxed as costs and reimbursed. Id. at *13-14.

In determining a reasonable attorney's fee, the Court applies the federal lodestar approach, which is calculated by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate for the services provided by counsel for the prevailing party. Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994). "Ultimately, the computation of a fee award is necessarily an exercise of judgment, because '[t]here is no precise rule or formula for making these determinations.'" Villano v. City of Boynton Beach, 254 F.3d 1302, 1305 (11th Cir. 2001)(internal citation omitted). Additionally, the Court is considered "an expert on the question [of attorney's fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." Norman v. Hous. Auth. of the City of Montgomery, 836 F. 2d 1292, 1302 (11th Cir. 1988).

**B.**     **The fees and costs which Z Keepers seeks are as follows:**

The basis for the fees and costs which Z Keepers seeks are described and itemized in the Affidavit of David Smith [DE 165], the Declaration J. Dixon [DE 164], the Declaration of C. Geitner [DE 166] and its supplemental exhibits [DE 167].  The total in fees of $155,645.00 and costs of $8,664.43 are calculated in the table attached as Exhibit 1 to the instant Motion.

As for the witness related costs, both Mr. Kaiser and Mr. Bogue are residents of Georgia, and traveled to Florida to attend trial. Only Mr. Kaiser, who arrived in Tampa the evening before trial, required a hotel while in Florida.

Considering the years and level of experience of both Defendant's trial counsel of $250 and $300 per hour reasonable, especially considering typical intellectual property litigation rate for attorneys in the Tampa Bay area, which are much higher.

WHEREFORE, Defendant Z Keepers, LLC respectfully requests an award of its reasonable fees of $155,645.00 and costs of $8,664.43, as the prevailing party, and that the Court grant such other and further relief as this court deems just and proper.

## Request for Oral Argument

Pursuant to Middle District Local Rule 3.01(j), Defendant requests oral argument at a hearing or via conference call on the instant motion.

## Certification Pursuant to M.D. Local Rule 3.01(g)

Undersigned has conferred with Plaintiff's counsel regarding the relief requested in this motion, who opposes this motion.

Respectfully submitted this 22nd day of October 2018.

**FISHER BROYLES, LLP**

*/s/ Charles G. Geitner*

Charles G. Geitner, Esq.
Florida Bar No.: 85170
100 S. Ashley Dr., Suite 600

Tampa, FL 33602
(813) 724-3140
(813) 724-3179 (facsimile)
Charles.Geitner@FisherBroyles.com

and

Jeffrey S. Dixon, *pro hac vice*
Illinois Bar No. 6291231
**Cygan Law Offices, P.C.**
1600 Golf Road, Suite 1200
Rolling Meadows IL, 60008
847-956-4915
Fax: 888-416-8495
*Attorneys for Defendant,*
*Z Keepers, LLC*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 22, 2018 a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Charles G. Geitner*
Charles G. Geitner, Esq.